**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MARTHA E. AGUINAGA, individually, and on behalf of all others similarly situated, ) ) ) | |
| Plaintiff, ) ) | Case No.1:22-cv-02947 |
| v. ) ) | |
| NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING, ) ) ) | |
| Defendant. ) | |

**CLASS ACTION COMPLAINT**

**NOW COMES** MARTHA E. AGUINAGA ("Plaintiff"), individually, and behalf of all others similarly situated, by and through her undersigned counsel, complaining of NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING ("Shellpoint"), as follows:

**NATURE OF THE ACTION**

1. Plaintiff brings this action seeking redress for violations of the Homeowners Protection Act ("HPA"), 12 U.S.C. §4901 *et seq*., violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*., breach of contract, and unjust enrichment.

2. Plaintiff's claims arise from Shellpoint's unlawful collection of private mortgage insurance ("PMI") premiums after the termination date of PMI. As a result of Shellpoint's conduct, Plaintiff was forced to pay PMI premiums after the contractual and statutory termination date to prevent her mortgage loan from falling into default status. Upon information and belief, Shellpoint's conduct in charging PMI after the PMI termination date is a widespread practice that has injured hundreds, if not thousands, of consumers in Illinois.

1

**JURISDICTION AND VENUE**

3. The Court has federal question jurisdiction pursuant to the HPA and Class Action Fairness Act of 2005 ("CAFA"). *See* 28 U.S.C. §1337.

4. The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because (1) complete diversity of citizenship exists, and (2) the amount in controversy exceeds the sum or value of $75,000.00.

5. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because all of the events or omissions giving rise to Plaintiff's claims occurred within this judicial district.

**PARTIES**

6. Plaintiff is a natural person domiciled in the State of Illinois.

7. At all times relevant, Plaintiff owned and resided at a condominium located at 2323 W. Pershing Road, Unit 214, Chicago, IL 60609 ("Property").

8. Shellpoint is a Delaware limited liability company with its principal place of business in Greenville, South Carolina.

9. Shellpoint Partners, LLC is the sole member of Shellpoint. Shellpoint Partners, LLC and its owners, NRM Acquisition, LLC and NRM Acquisition II, LLC; their owner, New Residential Mortgage, LLC; and its owner, New Residential Investment Corporation, each have a principal place of business in New York.

10. Shellpoint is a prominent mortgage servicer that services mortgage loans nationwide, including mortgage loans issued to Illinois consumers.

11. Shellpoint does business in Illinois and maintains a registered agent in Illinois.

**FACTUAL ALLEGATIONS**

12. In 2006, Plaintiff obtained a first mortgage loan ("Loan") from Countrywide Home Loans ("Countrywide") in the amount of $289,148 to fund the purchase of the Property.

13. At the time of purchase, the value of the Property was $300,000 ("original value") per an appraisal that was conducted at the time of purchase.

14. As part of the purchase, Plaintiff granted Countrywide a mortgage lien ("Mortgage") on the Property to secure the Loan.

15. The Property has been Plaintiff's principal residence since Plaintiff purchased the Property in 2006.

16. Pursuant to the terms of the Loan and Mortgage, Plaintiff was obligated to make PMI payments in the approximate amount of $189.59 per month.[1]

17. Pursuant to the terms of the Loan, Plaintiff had the right to request cancellation of the PMI on (1) "the date the principal balance of [the Loan] is first <u>scheduled</u> to reach 80% of the original value of the property"; or (2) "the date the principal balance of [the Loan] <u>actually</u> reaches 80% of the original value of the property." *See* attached Exhibit A, a true a correct copy of the Mortgage Insurance Disclosure. (emphasis in original)

18. Moreover, pursuant to the terms of the Loan and the HPA, the PMI would *automatically* terminate once the Loan "is first scheduled to reach 78% of the original value of the property" ("termination date") provided Plaintiff was current on her mortgage payments. *Id.* (emphasis added).

19. In 2019, Ditech Loan Servicing LLC ("Ditech") was the mortgage servicer for the Loan.

---

[1] PMI is a common mortgage insurance that is required for conventional loan borrowers who make low down payments on the purchase of their home.

3

20. In January 2019, believing that she met the 80% LTV threshold for PMI cancellation, Plaintiff sent a letter to Ditech requesting cancellation of the PMI.

21. On February 4, 2019, Ditech sent Plaintiff a correspondence denying Plaintiff's cancellation request on the basis that the current LTV was 84.7%, above the 80% threshold for cancellation.

22. The correspondence further stated that the PMI is **scheduled for cancellation on March 1, 2021.**

23. In November 2019, Shellpoint acquired and/or began servicing the Loan.

24. At the time Shellpoint acquired and/or began servicing the Loan, Plaintiff was contractually current on the payments on the Loan.

25. At the time Shellpoint began servicing the Loan, the PMI was still in place.

26. On February 9, 2020, Plaintiff sent a written communication to Shellpoint requesting cancellation of the PMI as Plaintiff believed she may have met the 80% LTV threshold for requested cancellation and the 78% threshold for automatic PMI termination.

27. At the time Plaintiff sent the correspondence, the principal balance on the Loan was $232,411.74, which translates to a 77.4% LTV ($232,411.74 principal balance / $300,000.00 original value).

28. On February 12, 2020, Shellpoint sent Plaintiff an email acknowledging receipt of Plaintiff's cancellation request.

29. On May 12, 2020, Shellpoint sent Plaintiff a correspondence denying Plaintiff's request for the cancellation of the PMI. *See* attached Exhibit B, a true and correct copy of Shellpoint's May 12, 2022 correspondence.

30. Specifically, the correspondence stated that the current LTV was 79.4% despite the fact that the LTV was no more than 77.4%. *Id.*

31. Notably, at the time Shellpoint sent the May 12, 2020 correspondence, the PMI should have already *automatically* terminated on March 1, 2021 per the terms of the Loan (the date the Loan was first scheduled to reach a 78% LTV of the original value of the property).

32. On July 7, 2020, in response to another cancellation request by Plaintiff, Shellpoint sent Plaintiff a correspondence again denying Plaintiff's request for cancellation of the PMI. *See* attached Exhibit C, a true and correct copy of Shellpoint's July 7, 2020 correspondence.

33. The correspondence stated in pertinent part:

"We cannot cancel your PMI because your property's value has not substantially increased."

"Although it's been at least two years since your mortgage loan closed, we cannot cancel your PMI because you have not made sufficient property improvements and your property is not located in an area where property values are rising. Because your property's value has not increased, **your property's LTV (loan-to-value) ratio has not decreased to 70% or less—which is what's required to cancel PMI on a Fannie Mae-backed loan as a result of home improvements or property-value increases**." *Id.* (emphasis added).

34. As demonstrated by the face of Shellpoint's July 7, 2020 correspondence, Shellpoint falsely represented that (1) PMI cancellation was dependent on the Property's value increasing; and (2) that the Loan must reach a 70% LTV for PMI cancellation/termination. In reality, PMI cancellation was not dependent on the Property's value increasing and the LTV threshold for automatic cancellation was 78% per the terms of the Loan and the HPA and not 70% as represented by Shellpoint. *Id.*

35. The correspondence further stated that Plaintiff can cancel the PMI by "making a one-time '**paydown' of $226,918.69**," which was approximately the *total balance* owed on the Loan as of July 2020. *Id.*

5

36. Moreover, the correspondence erroneously stated that Plaintiff's mortgage loan has been closed for at least two years. *Id.*

37. On July 28, 2020, Shellpoint sent Plaintiff a correspondence in response to another PMI cancellation request from Plaintiff. *See* Exhibit D, a true and correct copy of Shellpoint's July 28, 2020 correspondence.

38. The correspondence falsely stated that current LTV was 78.2%, above the 78% threshold necessary for automatic PMI termination. *Id.*

39. At the time Shellpoint sent the July 28, 2020 correspondence, the principal balance on the Loan was $226,110.91, which translates to a 75.3% LTV ($226,110.91 principal balance / $300,000.00 original value). Accordingly, Shellpoint's July 28, 2020 correspondence falsely represented the LTV in a manner that disqualified Plaintiff from automatic cancellation.

40. The correspondence further urged Plaintiff to obtain an appraisal for $400 or a BPO for $150 (both through Shellpoint) at her own expense to cancel the PMI. *Id.*

41. In August 2020 and September 2020, Plaintiff sent written correspondences to Shellpoint again requesting cancellation of the PMI.

42. In total, plaintiff submitted no less than four (4) written correspondences directly to Shellpoint challenging the continuing PMI charges and requesting PMI cancellation.

43. On October 14, 2020, Plaintiff submitted a complaint against Shellpoint to the Consumer Financial Protection Bureau ("CFPB") complaining of Shellpoint's unfair and deceptive mortgage servicing practices, including (1) Shellpoint's refusal to cancel the PMI despite the fact that Plaintiff's LTV was below the 78% automatic cancellation threshold (termination date); and (2) Shellpoint's attempts to extort Plaintiff out of money for an unnecessary appraisal ("First CFPB Complaint").

44. On October 30, 2020, Shellpoint responded to the First CFPB Complaint. Shellpoint's response falsely represented that the Loan is scheduled to reach a 78% LTV in May 2022 when in fact the Loan was *scheduled* to reach a 78% LTV much earlier.

45. Shellpoint's response further acknowledged that it previously erroneously denied Plaintiff's PMI cancellation request on the basis that Plaintiff had an inadequate payment history despite the fact that Plaintiff was current on the Loan.

46. Shellpoint did not cancel the PMI in response to the First CFPB Complaint.

47. On December 31, 2020, Plaintiff submitted another complaint against Shellpoint to the CFPB again complaining of Shellpoint's unfair and deceptive mortgage servicing practices, including Shellpoint's refusal to automatically cancel the PMI despite the fact that Plaintiff's LTV was below the automatic cancellation threshold; and (2) Shellpoint's attempts to extort Plaintiff out of money for an unnecessary appraisal ("Second CFPB Complaint").

48. On January 22, 2021, Shellpoint responded to the Second CFPB Complaint. Shellpoint's response correctly indicated that the principal balance on the Loan was $221,242.84 and that the original value of the Property was $300,000.00. However, Shellpoint's response erroneously indicated that the cancellation of the PMI was unwarranted because the LTV threshold is dependent on the *current value* of the property as opposed to the original value of the property. Accordingly, Shellpoint's response stated that Plaintiff did not meet the qualifications for automatic PMI cancellation.

49. Shellpoint did not cancel the PMI in response to the Second CFPB Complaint.

50. In June 2021, Plaintiff submitted a complaint against Shellpoint to the Illinois Attorney General complaining of Shellpoint's refusal to cancel the PMI.

51. Shellpoint did not cancel the PMI in response to Plaintiff's complaint to the Illinois Attorney General.

52. As set forth in Paragraph 22 above, the PMI should have automatically terminated no later than March 1, 2021.

53. Despite Plaintiff's repeated written disputes and complaints to governmental entities concerning Shellpoint's unlawful collection of PMI premiums, Shellpoint failed to cancel the PMI in a timely fashion.

54. In May 2022, Shellpoint finally canceled the PMI.

55. At all times relevant, Plaintiff complied with all terms of the Loan, including (1) providing Shellpoint with pre-suit notice of her dispute of the PMI charges prior to filing the instant lawsuit; and (2) making all mortgage payments in full and on time.

## **DAMAGES**

56. As a result of Shellpoint's unfair and deceptive mortgage servicing practices, Plaintiff has been significantly harmed.

57. Specifically, Plaintiff was forced to unfairly pay PMI premiums after the PMI should have been automatically terminated pursuant to the terms of the Loan and the HPA.

58. Plaintiff had no choice but to pay the PMI premiums as a failure to do so would have resulted in the Loan falling into a default status, therefore exposing Plaintiff to the risk of Defendant (1) filing a foreclosure proceeding against Plaintiff and the Property; and (2) assessing default fees to the Loan.

59. In addition to financial losses, Plaintiff suffered emotional distress and mental anguish as a result of Shellpoint's conduct. Specifically, Shellpoint's refusal to cancel the PMI

adversely impacted Plaintiff's purchasing power as she was forced to allocate a portion of her income to paying the erroneous PMI charges instead of other bills and necessities.

60. The chronic stress caused by Shellpoint's refusal to cancel the PMI has adversely impacted Plaintiff's general well-being and quality of life.

61. Moreover, Plaintiff lost significant time disputing Shellpoint's erroneous PMI charges and repeated refusal to cancel the same. In total, Plaintiff wasted no less than 65 hours dealing with the continuing PMI charges assessed by Shellpoint. As set forth above, Plaintiff repeatedly disputed the erroneous PMI charges with Shellpoint, only for Shellpoint to repeatedly refuse to cancel the PMI insurance.

## CLASS ALLEGATIONS

62. All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

63. Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3) individually, and on behalf of all others similarly situated ("Putative Class"). The Putative Class is defined as follows:

> All individuals in the State of Illinois (1) who have/had a mortgage loan serviced by Shellpoint; (2) in which Shellpoint continued to charge and collect PMI; (3) after the termination date of the PMI (the date the loan is first scheduled to reach a 78% LTV threshold); (4)) within the three years preceding the date of this complaint through the date of class certification.

64. The following individuals are excluded from the Putative Class: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Shellpoint, Shellpoint's subsidiaries, parents, successors, predecessors, and any entity in which Shellpoint or its parents have a controlling interest and their current or former employees, officers and directors; (3) Plaintiff's attorneys; (4) persons who properly execute and file a timely request for exclusion

from the Putative Class; (5) the legal representatives, successors or assigns of any such excluded persons; and (6) persons whose claims against Shellpoint have been fully and finally adjudicated and/or released.

### A. Numerosity

65. Upon information and belief, the members of the Putative Class are so numerous that joinder of them is impracticable.

66. The exact number of the members of the Putative Class is unknown to Plaintiff at this time and will be determined through discovery.

67. The members of the Putative Class are ascertainable because the Class is defined by reference to objective criteria.

68. The members of the Putative Class are identifiable in that their names, addresses, and telephone numbers can be identified in business records maintained by Shellpoint.

### B. Commonality and Predominance

69. There are many questions of law and fact common to the claims of Plaintiff and the Putative Class.

70. Those questions predominate over any questions that may affect individual members of the Putative Class.

### C. Typicality

71. Plaintiff's claims are typical of members of the Putative Class because Plaintiff and members of the Putative Class are entitled to damages as a result of Shellpoint's conduct.

### D. Superiority and Manageability

72. This case is also appropriate for class certification as class proceedings are superior to all other available methods for the efficient and fair adjudication of this controversy.

73. The damages suffered by the individual members of the Putative Class will likely be relatively small, especially given the burden and expense required for individual prosecution.

74. By contrast, a class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

75. Economies of effort, expense, and time will be fostered and uniformity of decisions ensured.

**E. Adequate Representation**

76. Plaintiff will adequately and fairly represent and protect the interests of the Putative Class.

77. Plaintiff has no interests antagonistic to those of the Putative Class and Shellpoint has no defenses unique to Plaintiff.

78. Plaintiff has retained competent and experienced counsel in consumer class action litigation.

**COUNT I –**
**Violations of the Homeowners Protection Act**
**(On behalf of Plaintiff and the Members of the Putative Class)**

79. All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

**a. Violations of §§4902(b) and (e) of the HPA**

80. Pursuant to §4902(b) of the HPA, PMI shall automatically terminate "on the termination date if, on that date, the mortgagor is current on the payments required by the terms of the residential mortgage transaction." 28 U.S.C. §4902(b)(1).

81. Section 4902(e)(2) prohibits a mortgage servicer from collecting PMI payments after PMI automatically terminates pursuant to §4902(b) of the HPA.

82. According to the terms of the Loan, the termination date for the PMI was "the date the principal balance of [the Loan] is first scheduled to reach 78% of the original value of the property." *See* Exhibit A.

83. The Loan was first scheduled to reach 78% of the original value of the Property no later than March 1, 2021. *See* Paragraph 22.

84. Shellpoint violated §4902(b) of the HPA by failing to terminate the PMI after the termination date. As set forth above, Plaintiff never defaulted on the Loan and was current on the Loan as of the termination date. Accordingly, Shellpoint was required to terminate the PMI on the termination date.

85. Shellpoint violated §4902(e)(2) by collecting no less than 14 PMI payments from Plaintiff after the PMI termination date.

    c.    **Violations of §4902(f)(1) of the HPA**

86. Section §4902(f)(1) of the HPA requires a mortgage servicer to return PMI payments collected after the PMI termination date within 45 days of the termination date.

87. Shellpoint violated §4902(f)(1) of the HPA by failing to return no less than 14 PMI payments it collected from Plaintiff within 45 days of the termination date.

**WHEREFORE,** Plaintiff on behalf of herself and the members of the Putative Class, request the following relief:

    a.    An order granting certification of the proposed class, including the designation of Plaintiff as the named representative, and the appointment of the undersigned as Class Counsel;

    b.    A judgment against Shellpoint for violations of the HPA;

c. An award of statutory damages to Plaintiff in the amount of $2,000 for each violation of the HPA;

d. An award of statutory damages to the putative class of $500,000 or 1% of Shellpoint's net worth, whichever is less;

e. An award of compensatory damages to Plaintiff and the putative class; and

f. An award of reasonable attorney's fees and costs.

<div style="text-align:center">

**COUNT II –**
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**(On behalf of Plaintiff and the Members of the Putative Class)**

</div>

88. All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

89. Plaintiff meets the ICFA definition of "consumer" and "person."

90. Shellpoint violated ICFA by employing unfair and deceptive acts and practices against Plaintiff.

91. Shellpoint specializes in mortgage lending, servicing, and debt collection.

92. These actions occur in the course of conduct involving trade or commerce.

93. Section 2 of ICFA provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false, pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived, or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to section 5(a) of the Federal Trade Commission Act.

a. **Unfairness and Deception**

94. Shellpoint's conduct as set forth herein objectively violates ICFA.

95. It was unfair and deceptive for Shellpoint to continue to charge Plaintiff for PMI insurance after the termination date.

96. It was unfair and deceptive for Shellpoint to (1) misrepresent the LTV threshold on numerous occasions; (2) condition the automatic cancellation of the PMI on both the original **and** current value of the Property; (3) attempt to extort Plaintiff out of unnecessary appraisal and/or BPO fees; (4) decline Plaintiff's repeated requests to cancel the PMI; and (5) make material misrepresentations to the CFPB regarding the legal requirements for PMI cancellation.

97. It was further unfair and deceptive for Shellpoint to:

   a. collect PMI premiums it was not contractually or legally entitled to;
   b. repeatedly fail to conduct meaningful investigations into Plaintiff's repeated disputes of the PMI charges;
   c. repeatedly fail to adequately respond to Plaintiff's repeated disputes; and
   d. fail to deal with Plaintiff in good faith.

98. Plaintiff had no choice but to submit to Shellpoint's unfair and deceptive conduct as Plaintiff had no choice but to pay the PMI premiums to keep the Loan in good standing and protect her credit history/score.

99. Shellpoint intended for Plaintiff to rely on its unfair and deceptive acts and Plaintiff in fact relied on the false representations by paying the unlawful PMI premiums.

100. Shellpoint's widespread scheme to defraud borrowers is driven by greed and is objectively deplorable.

101. Shellpoint's overall conduct as described herein is deceptive and against public policy.

102. As pled above, Plaintiff was significantly harmed by Shellpoint's conduct.

103. Shellpoint's conduct causes substantial injury to consumers generally because:

    a. consumers reasonably expect their mortgage company to cancel PMI after the termination date;

    b. consumer reasonably expect their mortgage company to not unilaterally modify the LTV threshold in an effort to extort additional PMI premiums from consumers;

    c. consumers reasonably expect their mortgage company to not collect amounts it is not entitled to;

    d. consumers reasonably expect their mortgage company to not try to extort them out of unnecessary appraisal and BPO fees;

    e. consumers reasonably expect their mortgage company to communicate with them truthfully and accurately regarding the status of their mortgage loans;

    f. consumers reasonably expect their mortgage company to investigate their disputes/grievances in good faith;

    g. consumers reasonably expect their mortgage company to comply with the HPA and other laws designed to protect consumers; and

    h. consumers reasonably expect their mortgage company to follow state and federal law and their own guidelines.

104. Shellpoint's conduct as described above is part of a pattern and practice in which Shellpoint routinely engages in as part of its business model.

105. Specifically, Shellpoint has been repeatedly sued by State Attorney Generals across the United States for engaging in unfair and deceptive mortgage servicing practices.

106. Shellpoint mistreats consumers on a wide scale and its unlawful conduct has been publicized and condemned.

107. Despite lawsuits filed by consumers and State Attorney Generals, Shellpoint brazenly continues to mistreat consumers nationwide.

108. Accordingly, an award of punitive damages is appropriate because Shellpoint's conduct towards Plaintiff and the Putative Class was willful, wanton, and demonstrates a reckless disregard for the rights of Plaintiff and the Putative Class.

109. Additionally, an award of punitive damages is appropriate to deter Shellpoint from future misconduct.

**WHEREFORE**, Plaintiff on behalf of herself and the members of the Putative Class, request the following relief:

a) An order granting certification of the proposed class, including the designation of Plaintiff as the named representative, and the appointment of the undersigned as Class Counsel;

b) A judgment against Shellpoint for violations of ICFA;

c) An order enjoining Shellpoint from charging consumers for PMI after the termination date;

d) An award of compensatory damages to Plaintiff and members of the Putative Class;

e) An award of punitive damages to Plaintiff and members of the Putative Class;

f) An award of Plaintiff's reasonable attorney's fees and costs; and

g) Any further relief this Court deems just and proper.

### COUNT III –
### Breach of Contract
### (Plaintiff Individually)

110. All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

111. The subject loan/mortgage is a valid and enforceable contract between Plaintiff and Countrywide and its successors and assigns ("the contract").

112. Upon information and belief, Shellpoint is a successor and assign of the subject loan and mortgage, and thus Shellpoint is bound by the terms of the contract.

113. Under Illinois law, every contract implies a covenant of good faith and fair dealing.

114. Plaintiff performed her duties under the contract by tendering all monthly payments to Shellpoint and its predecessors and by complying with all of the other terms of the contract.

115. Shellpoint materially breached the contract and its implied duty of good faith and fair dealing by:

    a. continuing to charge Plaintiff for PMI after the termination date;

    b. failing to cancel the PMI after the termination date;

    c. conditioning the cancellation of the PMI on both the original **and** current value of the Property;

    d. failing to meaningfully investigate Plaintiff's disputes;

    e. failing to adequately respond to Plaintiff's disputes; and.

    f. failing to deal with Plaintiff in good faith.

116. As stated above, Shellpoint's breach of contract has caused Plaintiff significant economic and non-economic damages.

117. Moreover, Plaintiff is entitled to punitive damages for Shellpoint's breach of contract because Shellpoint's conduct resulted in willful torts (e.g. fraud) accompanied by "wantonness" and "oppression." *See Hunter Douglas Metals, Inc. v. Edward C. Mange Trading Co.*, 586 F. Supp. 926, 929 (7th Cir. 1984) (finding that where a breach of contract contains allegations sufficient to support both a contract claim and an independent tort, both may stand and punitive damages may be awarded if plaintiff is able to sustain his burden under the tort theory.)

**WHEREFORE,** Plaintiff requests the following relief:

    a) A judgment against Shellpoint for breach of contract;

    b)    An award of compensatory damages to Plaintiff for Shellpoint's breach of contract;

    c)    An award of punitive damages for Shellpoint's willful conduct; and

    d)    Any other relief this Honorable Court deems just and proper.

<div align="center">

**COUNT IV–**
**Unjust Enrichment**
**(Plaintiff Individually)**

</div>

118. All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

119. Plaintiff's unjust enrichment claim is pled in the alternative in case there is a finding that there is no enforceable contract between Plaintiff and Shellpoint.

120. To state a claim for unjust enrichment in Illinois, "a plaintiff must allege that (1) the defendant has unjustly retained a benefit to the plaintiff's detriment, and (2) that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Horwitz v. Wells Fargo*, 2012 U.S. Dist. LEXIS 164520, at *6 (N.D. Ill. 2012).

121. Shellpoint unjustly retained a benefit to Plaintiff's detriment by unfairly and deceptively collecting PMI premiums it was not entitled to.

122. Shellpoint's retention of such amounts objectively violates the fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, Plaintiff requests the following relief:

    a.    A judgment against Shellpoint for unjust enrichment;

    b.    An award of compensatory damages to Plaintiff; and

    c.    Any further relief this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: June 6, 2022                                                                 Respectfully Submitted,

/s/ *Mohammed O. Badwan*

Mohammed O. Badwan
Sulaiman Law Group, Ltd.
2500 S. Highland Ave., Ste. 200
Lombard, IL 60148
Phone (630) 575-8180
mbadwan@sulaimanlaw.com
*Counsel for Plaintiff*